T.C. Memo. 2020-81

UNITED STATES TAX COURT

JAMES C. NELSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARY P. NELSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27313-13, 27321-13.[1]          Filed June 10, 2020.


<u>Bradley G. Korell</u>, <u>Todd A. Kraft</u>, <u>Rachael E. Rubenstein</u>, <u>Farley P. Katz</u>,

and <u>Theodore J. Wu</u>, for petitioners.

<u>Bryan J. Dotson</u> and <u>Sheila R. Pattison</u>, for respondent.

_____

[1] On July 14, 2014, we consolidated these cases for trial, briefing, and opinion.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, Judge:  In these consolidated cases respondent determined the following deficiencies in gift tax and accuracy-related penalties in notices of deficiency issued to Mr. and Mrs. Nelson on August 29, 2013:[2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2008 | $611,708 | $122,342 |
| 2009 | 6,123,168 | 1,224,634 |

After respondent conceded the accuracy-related penalties, the issues for decision are:  (1) whether the interests in Longspar Partners, Ltd. (Longspar), transferred on December 31, 2008, and January 2, 2009, were fixed dollar amounts or percentage interests and (2) the fair market values of those interests.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulated facts are incorporated in our findings by this reference.  Petitioners were residents of Texas when they timely filed their petitions.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[*3] I.  <u>Warren Equipment Co.</u>

    A.  <u>Background</u>

In 1971 Johnny Warren, Mrs. Nelson's father, cofounded Compressor Systems, Inc. (CSI), with another family.  CSI sells and rents gas compression equipment to the oil and gas industry and provides financing and maintenance services in connection with that equipment.[3]  In 1975 Mr. Warren and his brother-in-law purchased the other family's portion of CSI, after which the company was solely owned by the Warren family.  In 1985 Mr. Warren purchased the assets of a Caterpillar dealer operating in Abilene and Odessa, Texas, and Caterpillar approved him as the principal dealer for that territory.  Throughout the 1990s and 2000s Mr. Warren continued to expand his family businesses, many of which focus on the oil and gas industries and operate throughout the Southwest United States, the Rocky Mountains, and internationally in South America and Mexico.

As part of this expansion, on September 26, 1990, Warren Equipment Co. (WEC) was organized as a Delaware corporation.  WEC is a holding company that owns 100% of each of its seven operating subsidiaries, including CSI.

---

[3] For readability our findings of fact generally are stated in the present tense but are as of December 31, 2008 (valuation date), unless otherwise stated.

**[*4]**  B.  Operating Subsidiaries

The largest of WEC's subsidiaries is Warren Power & Machinery, L.P., which does business as Warren Cat.  It accounts for approximately 51% of WEC's value.  Warren Cat is the exclusive dealer for Caterpillar engines and earth-moving equipment and machinery in its territory, which includes almost all of Oklahoma and a large area in West Texas.  Warren Cat was required to enter into a sales and service agreement with Caterpillar that authorizes it to sell Caterpillar equipment and products.  That agreement sets out the terms of their relationship as well as their respective rights and responsibilities.

Because Warren Cat is a dealer, not a franchisee, it cannot sell the rights to the Caterpillar dealership. When Caterpillar terminates a relationship with one of its dealers, Caterpillar chooses a successor and the successor purchases the previous dealer's assets for their net asset value.  After Mr. Warren's death in 1999 Caterpillar gave notice that it was terminating its relationship with Warren Cat as a dealer.  Mr. Warren's son-in-law, Mr. Nelson, applied for and was approved as Warren Cat's dealer principal in November 1999.  Mr. Nelson and Caterpillar subsequently agreed to expand Warren Cat's territory to its current area in April 2002 so that Warren Cat could purchase the assets of another Caterpillar dealership, Darr Equipment Co.

**[*5]** CSI, WEC's next largest subsidiary, accounts for approximately 45% of WEC's value. Based in Midland, Texas, CSI employs about 700 people and serves much of the Western United States. CSI is the sole owner of Pump Systems International, Inc. (PSI), which designs and sells fluid pump systems to the oil industry around the world. In addition, CSI is the sole owner of Rotary Compressor Systems, Inc., and Engines, Parts, & Service, Inc.

WEC's other subsidiaries are: Warren Administration Co. (Warren Admin), which provides administrative services such as accounting, information technology, risk management, and legal services for WEC's operating companies; Ignition Systems & Controls, L.P. (ISC), which is an authorized dealer of Altronic ignition and control systems throughout the Central United States; North American Power Systems, Inc. (NorAm), which sells small light towers and generators; Perkins South Plains, Inc. (PSP), which is a distributor of Perkins engines for industrial applications; and Warren Real Estate Holdings, Inc. (WREH), which finances and holds all real estate used by the operating companies, leasing it to each WEC operating company in exchange for rent payments.

[*6]   C.   <u>Ownership and Shareholders Agreement</u>

As of the valuation date, 237,407 shares of WEC common stock were outstanding.  Most of the common stock was held by Mrs. Nelson (indirectly through Longspar as discussed below) and her siblings:  Rick Warren, Walter Stirling Warren, and Jeffrey Somers.  WEC's management and Carole Warren, Mr. Warren's wife, each held a small number of the remaining shares.  Mrs. Warren also held all of the outstanding shares of WEC preferred stock, with the same voting rights as shares of common stock.

A shareholders agreement (WEC shareholders agreement) restricts the transferability of WEC common stock.[4]  It provides that the WEC board of directors must approve all transfers of WEC common stock, and any transfer made in violation of the WEC shareholders agreement is null and void.  The WEC shareholders agreement provides two routes for a shareholder who wishes to sell his or her shares.  First, the shareholder can sell to a permitted transferee. Permitted transferees include Mr. Warren's lineal descendants and their spouses; a trust, family partnership or other entity organized for the benefit of a lineal descendant; a tax-exempt organization described in section 501(c)(3); or a bank to

---

[4] Rick Warren, WEC's nonfamily management, and Mrs. Warren are not subject to the WEC shareholders agreement.  However, they are subject to other agreements imposing restrictions on the transferability of their WEC stock.

[*7] which a security interest is granted for purposes of obtaining a loan.  If shares are transferred to a permitted transferee, the transferee will succeed to all of the transferor's rights and obligations with respect to the shares and will hold them subject to the agreement.  Second, the shareholder can exercise the put option included in the WEC shareholders agreement, which allows a shareholder to sell a portion of his or her shares to WEC at book value.  The portion the shareholder can sell is dependent on the shareholder's age at the time he or she exercises the put option.  If a shareholder chooses to exercise the put option, the other shareholders have the right to intervene and purchase the shares first.

## II.  Longspar Partners, Ltd.

Longspar was formed on October 1, 2008, as a Texas limited partnership based in Midland, Texas.  It was formed as part of a tax planning strategy to (1) consolidate and protect assets, (2) establish a mechanism to make gifts without fractionalizing interests, and (3) ensure that WEC remained in business and under the control of the Warren family.

Mr. and Mrs. Nelson are Longspar's sole general partners, each holding a 50% general partner interest (together holding a 1% interest in Longspar as general partners).  On the valuation date, Longspar's limited partners and their percentage interests were as follows:

[*8]

| Limited partner | Percentage interest |
|---|---|
| Mary P. Nelson | 93.88 |
| Mary P. Nelson, as custodian for Carole A. Nelson under the Texas Uniform Transfers to Minors Act | 1.83 |
| Mary P. Nelson, as custodian for Mary C. Nelson under the Texas Uniform Transfers to Minors Act | 0.88 |
| Mary P. Nelson, as custodian for Paige F. Nelson under the Texas Uniform Transfers to Minors Act | 0.88 |
| Steven C. Lindgren, as trustee of the Mary Catherine Nelson 2000 Trust | 0.51 |
| Steven C. Lindgren, as trustee of the Paige Francis Nelson 2000 Trust | 0.51 |
| Steven C. Lindgren, as trustee of the Sarah Elizabeth Nelson 2000 trust | 0.51 |

All partners made initial contributions of capital in the form of shares of WEC common stock.

On the valuation date, Longspar owned 65,837 shares (approximately 27%) of WEC common stock. It also owned the following:

[*9]

| Asset | Value |
|---|---|
| MyVest Account (Cash) | $9,470 |
| MyVest Account (Marketable Securities) | 158,344 |
| Limited Partner Interest in Stevens & Tull Opportunity Fund I, L.P. | 14,411 |
| Limited Partner Interest in Stevens & Tull Opportunity Fund II, L.P. | 368,411 |
| Limited Partner Interest in Sanders Opportunity Fund, L.P. | 63,331 |
| Note Receivable from Exponential, Inc. | 25,000 |
| Accounts receivable | 35,380 |
| Total | 674,347 |

Its only liability was accounts payable of $5,000.

Longspar's partnership agreement grants its general partners full control over all partnership activities.  Their powers include, among others, determining partnership activities, making expenditures and incurring indebtedness, using partnership assets, making distributions, and hiring advisers.  Certain powers are subject to limitations and require approval by all partners, such as selling or disposing of substantially all partnership assets, leasing a significant portion of partnership assets for a term longer than 24 months, incurring indebtedness in excess of $5 million, or doing anything making it impossible for Longspar to carry

**[*10]** on its ordinary business. Limited partners are not authorized under the partnership agreement to play any role in Longspar's management beyond their veto power over certain actions.

The partnership agreement restricts the general and limited partners' transfer of their Longspar interests. It allows transfers of a limited partner interest to family members and to third parties. If the transfer is to a third party, the general partners have to consent in writing or the interest first must be offered to Longspar and then to the other partners at equal or better terms. The third-party transferee is treated as an assignee--entitled only to partnership allocations and distributions--until substituted as a partner. The transfer of a general partner interest in Longspar without written consent of all partners is prohibited. Any transfers in violation of the terms of the partnership agreement are null and void.

III. <u>Succession Plan and Transfers</u>

On December 23, 2008, petitioners formed the Nelson 2008 Descendants Trust (Trust) with Mrs. Nelson as settlor and Mr. Nelson as trustee. Mr. Nelson is a beneficiary of the Trust, along with their four daughters.

Mrs. Nelson made two transfers of limited partner interests in Longspar to the Trust. The first transfer was a gift on December 31, 2008. The Memorandum

[*11] of Gift and Assignment of Limited Partner Interest (memorandum of gift)

provides:

> [Mrs. Nelson] desires to make a gift and to assign to * * * [the Trust]
> her right, title, and interest in a limited partner interest having a fair
> market value of TWO MILLION NINETY-SIX THOUSAND AND
> NO/100THS DOLLARS ($2,096,000.00) as of December 31, 2008
> * * *, as determined by a qualified appraiser within ninety (90) days
> of the effective date of this Assignment.

Petitioners structured the second transfer, on January 2, 2009, as a sale. The

Memorandum of Sale and Assignment of Limited Partner Interest (memorandum

of sale) provides:

> [Mrs. Nelson] desires to sell and assign to * * * [the Trust] her right,
> title, and interest in a limited partner interest having a fair market
> value of TWENTY MILLION AND NO/100THS DOLLARS
> ($20,000,000.00) as of January 2, 2009 * * *, as determined by a
> qualified appraiser within one hundred eighty (180) days of the
> effective date of this Assignment * * *.

Neither the memorandum of gift nor the memorandum of sale (collectively transfer

instruments) contains clauses defining fair market value or subjecting the limited

partner interests to reallocation after the valuation date.

In connection with the second transfer, the Trust executed a promissory note

for $20 million (note). Mr. Nelson, as trustee, signed the note on behalf of the

Trust. The note provides for 2.06% interest on unpaid principal and 10% interest

on matured, unpaid amounts, compounded annually, and is secured by the limited

[*12] partner interest that was sold. Annual interest payments on the note were due to Mrs. Nelson through the end of 2017.

Petitioners retained Roy Shrode to complete an appraisal of Longspar in connection with the transfers. Mr. Shrode concluded that, as of the valuation date, the fair market value of a 1% limited partner interest in Longspar was $341,000. In arriving at his conclusion, Mr. Shrode relied on a fair market valuation of WEC's common stock completed by Barbara Rayner of Ernst & Young.[5] On the basis of his valuation, Mr. Shrode calculated that Mrs. Nelson's December 31, 2008, and January 2, 2009, transfers equated to the rounded amounts of 6.14% and 58.65% limited partner interests in Longspar, respectively. Because the transfers were so close together, Ms. Rayner and Mr. Shrode used December 31, 2008, as the valuation date. We likewise will use the same date for both transfers, consistent with their testimony at trial and with that of respondent's expert.

Longspar's partnership agreement was amended effective January 2, 2009, to reflect transfers of 6.14% and 58.65% limited partner interests from Mrs. Nelson to the Trust. Longspar reported the reductions of Mrs. Nelson's limited partner interest and the increases of the Trust's limited partner interests on the

---

[5] Ms. Rayner valued WEC common stock as of December 31, 2008, and that value did not change as of January 2, 2009.

**[*13]** Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., attached to its Forms 1065, U.S. Return of Partnership Income, for 2008 through 2013. Longspar also made a proportional cash distribution to its partners on December 31, 2011. The Trust's portion of the cash distribution--64.79%--was based on Mr. Shrode's valuation.

IV.  Petitioners' Tax Returns and Examination

Petitioners filed separate Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Returns, for 2008 and 2009. On their 2008 Forms 709 they each reported the gift to the Trust "having a fair market value of $2,096,000 as determined by independent appraisal to be a 6.1466275% limited partner interest" in Longspar. They classified it as a split gift and reported that each person was responsible for half ($1,048,000). They did not report the January 2, 2009, transfer of the Longspar limited partner interest on their 2009 Forms 709, consistent with its treatment as a sale.

Respondent selected petitioners' 2008 and 2009 Forms 709 for examination. On May 21, 2012, petitioners entered into the administrative appeal process.

[*14] Petitioners and the Internal Revenue Service (IRS) Office of Appeals (IRS Appeals) negotiated a proposed settlement agreement, but it was never completed.[6]

On the basis of their settlement discussions with IRS Appeals, petitioners amended Longspar's partnership agreement to record the Trust's limited partner interest in Longspar as 38.55% and made corresponding adjustments to the books for Longspar and the Trust. Longspar also adjusted prior distributions and made a subsequent proportional cash distribution to its partners to reflect the newly adjusted interests.

In the August 29, 2013, notices of deficiency respondent determined that petitioners had undervalued the December 31, 2008, gift, and their halves of the gift each were worth $1,761,009 rather than $1,048,000 as of the valuation date. Respondent also determined that petitioners had undervalued the January 2, 2009, transfer by $13,607,038, and therefore they each had made a split gift in 2009 of $6,803,519.

---

[6] Petitioners initially argued that the proposed settlement agreement was completed and binding. They subsequently abandoned this argument.

**[*15]**                                                    OPINION

I.  Burden of Proof

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Under section 7491(a), in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner.  At trial petitioners orally moved to shift the burden of proof.  We resolve these cases on the basis of a preponderance of the evidence in the record.  See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo. 2007-340; Schank v. Commissioner, T.C. Memo. 2015-235, at *16.  We, therefore, will deny petitioners' motion to shift the burden of proof as moot.

II.  General Gift Tax Principles

Section 2501(a) imposes a tax on the transfer of property by gift.  When "property is transferred for less than an adequate and full consideration * * * then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift".  Sec. 2512(b).  Conversely, property exchanged for "adequate and full consideration" does not constitute a gift for Federal gift tax purposes.  See id.  The regulations confirm that "[t]he gift tax is not applicable to a transfer for a full and adequate consideration in money or

[*16] money's worth, or to ordinary business transactions". Sec. 25.2511-1(g)(1), Gift Tax Regs. The regulations define a transfer in the ordinary course of business as "a transaction which is bona fide, at arm's length, and free from any donative intent". Sec. 25.2512-8, Gift Tax Regs.; see Weller v. Commissioner, 38 T.C. 790, 805-806 (1962). A transaction meeting this standard "will be considered as made for an adequate and full consideration in money or money's worth." Sec. 25.2512-8, Gift Tax Regs. But a transaction between family members is "subject to special scrutiny, and the presumption is that a transfer between family members is a gift." Frazee v. Commissioner, 98 T.C. 554, 561 (1992) (quoting Harwood v. Commissioner, 82 T.C. 239, 258 (1984), aff'd without published opinion, 786 F.2d 1174 (9th Cir. 1986)).

Petitioners reported the first transfer of an interest in Longspar as a gift and the second as a sale. To redetermine the amount of any gift tax due on all or part of these transfers, we must decide the value of the interests transferred. But before we can turn to valuation, we must decide the nature of the interests transferred.

III. Nature of the Interests Transferred

The parties agree that the transfers were complete once Mrs. Nelson executed the transfer instruments parting with dominion and control over the interests. See Burnet v. Guggenheim, 288 U.S. 280, 286 (1933); Carrington v.

**[\*17]** <u>Commissioner</u>, 476 F.2d 704 (5th Cir. 1973), <u>aff'g</u> T.C. Memo. 1971-222; <u>Estate of Metzger v. Commissioner</u>, 100 T.C. 204, 208 (1993), <u>aff'd</u>, 38 F.3d 118 (4th Cir. 1994); sec. 25.2511-2(b), Gift Tax Regs. But they disagree over whether Mrs. Nelson transferred Longspar limited partner interests of $2,096,000 and $20 million, as petitioners contend, or percentage interests of 6.14% and 58.65%, as respondent contends.

We look to the transfer documents rather than subsequent events to decide the amount of property given away by a taxpayer in a completed gift. <u>See</u> <u>Estate of Petter v. Commissioner</u>, T.C. Memo. 2009-280, 2009 WL 4598137, at \*12 (citing <u>Succession of McCord v. Commissioner</u>, 461 F.3d 614, 627 (5th Cir. 2006), <u>rev'g and remanding</u> 120 T.C. 358 (2003)), <u>aff'd</u>, 653 F.3d 1012 (9th Cir. 2011); <u>see also</u> <u>Commissioner v. Procter</u>, 142 F.2d 824 (4th Cir. 1944) (disregarding the subsequent reallocation of property to the donor via a saving clause as contrary to public policy), <u>rev'g and remanding</u> a Memorandum Opinion of this Court. Petitioners argue that the transfer instruments show that Mrs. Nelson transferred specific dollar amounts, not fixed percentages, citing a series of cases that have respected formula clauses as transferring fixed dollar amounts of ownership interests. In each of those cases we respected the terms of the formula, even though the percentage amount was not known until fair market value was

**[*18]** subsequently determined, because the dollar amount was known. Wandry v. Commissioner, T.C. Memo. 2012-88, 2012 WL 998483, at *4; Hendrix v. Commissioner, T.C. Memo. 2011-133, 2011 WL 2457401, at *5-*9; Estate of Petter v. Commissioner, 2009 WL 4598137, at *11-*16.

Saving clauses have been treated differently. As we explained in Estate of Petter and Wandry, courts have rejected saving clauses because they relied on conditions subsequent to adjust the gifts or transfers so the size of the transfer (as measured either in dollar amount or percentage) could not be known. Thus, for example, in Commissioner v. Procter, 142 F.2d at 827, the Court of Appeals for the Fourth Circuit rejected a clause adjusting part of a gift to "automatically be deemed not to be included in the conveyance in trust hereunder and shall remain the sole property of * * * [the taxpayer]" because the adjustment would be triggered only by a "final judgment or order of a competent federal court of last resort that any part of the transfer * * * is subject to gift tax."

In Succession of McCord v. Commissioner, 461 F.3d at 618, the Court of Appeals for the Fifth Circuit upheld a gift of an interest in a partnership expressed as "a dollar amount of fair market value in interest" reduced by a transfer tax obligation rather than a percentage interest that was determined in agreements subsequent to the gift. It held that "a gift is valued as of the date that it is

[*19] complete; the flip side of that maxim is that subsequent occurrences are off limits." Id. at 626. The formula clause in the initial transfer document did not include qualifying language that fair market value was to be "as finally determined for [Federal gift] tax purposes," but the court did not find that omission fatal because the value of the gift was ascertainable as of the date it was complete. Id. at 627.

Petitioners argue that we should construe the transfer clauses here as more akin to the formula clauses that were upheld in Succession of McCord, Estate of Petter, and Wandry, that is, read them as transferring dollar amounts rather than percentages. However, as part of their argument, they cite evidence of their intent, which includes their settlement discussions with IRS Appeals and subsequent adjustments to reflect changes in valuation to reflect those discussions. Of course, as in Succession of McCord, we look to the terms of the transfer instruments and not to the parties' later actions except to the extent that we conclude the terms are ambiguous and their actions reveal their understanding of those terms. Id. at 627-628.

Therefore, to decide whether the transfers were of fixed dollar amounts or fixed percentages, we start with the clauses themselves, rather than the parties' subsequent actions. The gift is expressed in the memorandum of gift as a "limited

[*20] partner interest having a fair market value of TWO MILLION NINETY-SIX THOUSAND AND NO/100THS DOLLARS ($2,096,000.00) as of December 31, 2008 * * *, as determined by a qualified appraiser within ninety (90) days of the effective date of this Assignment."  Similarly, the sale is expressed in the memorandum of sale as a "limited partner interest having a fair market value of TWENTY MILLION AND NO/100THS DOLLARS ($20,000,000.00) as of January 2, 2009 * * *, as determined by a qualified appraiser within one hundred eighty (180) days of the effective date of this Assignment."

The transferred interests thus are expressed in the transfer instruments as an interest having a fair market value of a specified amount as determined by an appraiser within a fixed period.  The clauses hang on the determination by an appraiser within a fixed period; value is not qualified further, for example, as that determined for Federal estate tax purposes.  See, e.g., Estate of Christiansen v. Commissioner, 130 T.C. 1, 14-18 (2008) (upholding gift clause providing fair market value "as such value is finally determined for federal estate tax purposes"), aff'd, 586 F.3d 1061 (8th Cir. 2009); Estate of Petter v. Commissioner, 2009 WL 4598137, at *11-*16 (upholding gift clause transferring the number of units of a limited liability company "that equals one-half the minimum * * * dollar amount that can pass free of federal gift tax by reason of Transferor's applicable exclusion

[*21] amount" along with a clause providing for an adjustment to the number of units if the value "is finally determined for federal gift tax purposes to exceed the amount described" in the first clause).

Unlike the clause in <u>Succession of McCord</u>, "fair market value" here already is expressly qualified. By urging us to interpret the operative terms in the transfer instruments as transferring dollar values of the limited partner interests on the bases of fair market value as later determined for Federal gift and estate tax purposes, petitioners ask us, in effect, to ignore "qualified appraiser * * * [here, Mr. Shrode] within * * * [a fixed period]" and replace it with "for federal gift and estate tax purposes." While they may have intended this, they did not write this. They are bound by what they wrote at the time. As the texts of the clauses required the determination of an appraiser within a fixed period to ascertain the interests being transferred, we conclude that Mrs. Nelson transferred 6.14% and 58.35% of limited partner interests in Longspar to the Trust as was determined by Mr. Shrode within a fixed period.

IV.  Values of the Transferred Interests

A.  General Principles

The next question we must decide is the fair market values of the interests that Mrs. Nelson transferred to the Trust. We start as we must with the statute,

**[*22]** which provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Sec. 2512(a). Generally, the "valuation of property for federal tax purpose is a question of fact". Adams v. United States, 218 F.3d 383, 385-386 (5th Cir. 2000); see also Whitehouse Hotel Ltd. P'ship v. Commissioner, 615 F.3d 321, 333 (5th Cir. 2010) (holding that valuation is a mixed question of fact and law; factual findings are "subject to review on a clearly erroneous standard" and legal conclusions, such as the proper fair-market valuation method, are "subject to de novo review"), vacating and remanding 131 T.C. 112 (2008). The fair market value of property transferred is the price at which it would change hands between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); sec. 25.2512-1, Gift Tax Regs. The willing buyer and willing seller are "purely hypothetical figure[s] and valuation does not take into account the personal characteristics of the actual recipients of the * * * [property being valued]." See Estate of Newhouse v. Commissioner, 94 T.C. at 218 (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981)).

[*23] With respect to a closely held entity, a determination of its fair market value for Federal gift tax purposes depends upon all of the relevant facts and circumstances.  See Estate of Smith v. Commissioner, 198 F.3d 515, 526 (5th Cir. 1999) rev'g and remanding 108 T.C. 412 (1997).  See generally Rev. Rul. 59-60, 1959-1 C.B. 237, 242.  These relevant facts and circumstances include whether discounts for lack of control and lack of marketability factor into the fair market value of a closely held entity's stock.  See Estate of Newhouse v. Commissioner, 94 T.C. at 249; Estate of Magnin v. Commissioner, T.C. Memo. 2001-31, 2001 WL 117645, at *6-*7.

B.  Experts

To resolve valuation issues we may consider expert witness opinions properly admitted into evidence.  See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938).  Both parties submitted expert reports and testimony to support their valuation of a Longspar partnership interest.

Petitioners rely on Mr. Shrode, a partner at Shrode & Parham, PLLC, who has performed over 50 appraisals of business interests in corporations and partnerships for gift and estate tax purposes.  Respondent relies upon Mark Mitchell, a partner and director of valuation services at Peterson Sullivan, LLP. Mr. Mitchell has been retained well over 100 times as an expert witness to

[*24] determine valuations and appropriate discount rates for businesses, including in Hoffman v. Commissioner, T.C. Memo. 2001-109, and in Grieve v. Commissioner, T.C. Memo. 2020-28. Both in turn rely on a valuation of WEC common stock by Ms. Rayner, a U.S. quality and risk management partner in Ernst & Young's transaction advisory services group with extensive experience in conducting valuations who testified for petitioners, with Mr. Mitchell making certain adjustments that we discuss below in our analysis of their testimony. We recognized all three as valuation experts.

We weigh each expert's opinion in the light of the expert's qualifications and other credible evidence. See Estate of Newhouse v. Commissioner, 94 T.C. at 217. When considering an expert's opinion, we have "broad discretion to evaluate the cogency of * * * [the] expert's analysis". Davis v. Commissioner, T.C. Memo. 2015-88, at *40 (citing Gibson & Assocs., Inc. v. Commissioner, 136 T.C. 195, 229-230 (2011)). If we find one expert's opinion persuasive, we may accept that opinion in whole or in part over that of the opposing expert. Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998); see also Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). Or we may reach "an intermediate conclusion as to value" by drawing selectively from the testimony of various experts. Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Gibson &

[*25] Assocs., Inc. v. Commissioner, 136 T.C. at 230 (holding that we "may embrace or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion we choose to adopt"). For a value (or discount) it is "not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence." Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), aff'g in part, remanding in part T.C. Memo. 1956-178.

C. Arguments and Analysis

1. WEC Common Stock

The parties and their experts agree that the valuation of a Longspar limited partnership interest requires a valuation of WEC common stock. We too will start there.

Because WEC is a holding company that owns 100% of each of its subsidiaries, Ms. Rayner calculated the estimated value for all WEC stock by determining the fair market value for each WEC subsidiary. She combined those values and subtracted WEC's interest-bearing debt and preferred stock to determine the total fair market value of WEC's common equity to be $363.7 million on a controlling interest basis before any discounts. As of the valuation date, there were 237,407 common shares outstanding, resulting in a fair market

**[*26]** value of $1,532 per share of WEC common stock before discounts. Ms. Rayner then applied a 20% discount for lack of control and a 30% discount for lack of marketability to determine a fair market value of $860 per share of WEC common stock on a minority and nonmarketable basis.

Mr. Mitchell accepted Ms. Rayner's per-share valuation of WEC's common stock of $1,532 before discounts and agreed with her 30% discount for lack of marketability but contended that her valuation of each WEC subsidiary was on a noncontrolling interest basis and therefore no discount for lack of control was necessary or appropriate. He therefore calculated a fair market value of $1,072 per share of WEC common stock on a nonmarketable basis. To resolve this dispute between the experts we must dig into Ms. Rayner's valuation of each subsidiary and her discount for lack of control.

### a. Warren Cat, ISC, and PSP

#### i. Ms. Rayner's Cost Approach

To determine the fair market value of WEC's largest subsidiary, Warren Cat, and two smaller heavy-equipment-dealing subsidiaries, ISC and PSP, Ms. Rayner used the cost approach. She had two reasons: First, the restrictive terms of the applicable sales and service agreements for each subsidiary would not permit use of the income or market approach, and second, the prices paid in actual

[*27] market transactions for other heavy-equipment dealers were determined solely on their net asset values.  Therefore, she used the net asset value method, which involves valuing all of the subsidiary's assets (including inventory, property, buildings, and equipment), adding them together, and subtracting out all outstanding liabilities (except interest-bearing debt).  Her calculations resulted in fair market values of approximately $388.6 million for Warren Cat, $11.2 million for ISC, and $6.3 million for PSP.

## ii.  Mr. Mitchell's Criticisms

Mr. Mitchell argued Ms. Rayner's use of the cost approach to value Warren Cat did not take into account intangible assets and therefore resulted in a noncontrolling value.[7]  He noted that the authoritative text that both he and Ms. Rayner cited throughout their reports, Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 374 (4th ed. 2000) (Pratt treatise), describes the cost approach as follows with respect to the level of value:

> The asset accumulation method--also called the adjusted net asset
> value method--generally indicates a controlling ownership level of
> value. This is because only a controlling stockholder could decide (1)
> to replace or liquidate the subject assets or (2) to put the subject
> assets to their highest and best use in a going-concern context.  If the
> economic value of all of the subject company intangible assets is

---

[7] Mr. Mitchell noted that his analysis also applies to ISC and PSP, but he did not conduct separate analyses.

[*28] captured in the asset-based approach valuation, then noncontrolling shares typically would sell at a lack of control discount from the indicated value. In other words, if the application of the asset accumulation method encompasses both (1) the value of all the tangible assets (and their highest and best use) and (2) the economic value of all the intangible assets, then the indicated lack of control discount would normally need to be applied in order to indicate a noncontrolling ownership interest level of value.

Mr. Mitchell noted that Ms. Rayner's analysis encompassed only the value of Warren Cat's tangible assets. He examined Warren Cat's past operating performance and noted that the results indicated excess economic returns and the presence of intangible asset value. He concluded that Ms. Rayner's failure to include that intangible asset value in her analysis resulted in a fair market value for Warren Cat on a noncontrolling interest basis and precluded the use of a minority interest discount.

### iii. Analysis

We disagree with Mr. Mitchell's contention that Ms. Rayner's valuations of Warren Cat resulted in a noncontrolling value merely because she failed to account for intangible assets. Ms. Rayner explained that these values did not include intangible assets because a heavy-equipment dealer would not convey intangible assets as part of a net-asset-value-based transaction.

**[\*29]** We previously have disregarded intangible assets such as goodwill under similar circumstances. In Zorniger v. Commissioner, 62 T.C. 435, 444-445 (1974), we concluded that goodwill does not play a role in valuing a dealership. We relied on Noyes-Buick Co. v. Nichols, 14 F.2d 548 (D. Mass. 1926), in which the District Court concluded that a dealership doing extensive business in a populous territory on the basis of personal relations between the dealership and the manufacturer did not have valuable goodwill because it could not "believe that any reasonable person would pay any substantial sum for good will, resting on such an insecure and precarious foundation." Zorniger v. Commissioner, 62 T.C. at 445 (quoting Noyes-Buick Co., 14 F.2d at 549).

We also find that Ms. Rayner did consider Warren Cat's intangible assets in her valuation. She pointed out the restrictions in the sales agreements that constituted a large portion of Warren Cat's intangible assets. The Pratt treatise states that an adjustment to the valuation of intangible assets may be necessary to account for external obsolescence, which is the "reduction in value due to the effects, events, or conditions that are external to--and not controlled by--the current use or condition of the intangible." Pratt et al., supra, at 330. Here, the restrictive terms of the sales and service agreements for each subsidiary may eliminate the value of the subsidiary's intangible assets to a hypothetical buyer.

[*30] Ms. Rayner argued that these valuations all reflected controlling interest values because every comparable property transaction she considered involved a sale of the entire entity. Because she valued all of each subsidiary's remaining tangible assets, her valuations resulted in fair market values on a controlling interest basis.

### b. CSI, PSI, and NorAm

#### i. Ms. Rayner's Income and Market Approaches

To determine the fair market values for CSI, PSI, and NorAm, Ms. Rayner used the income approach because that approach considered future earning capacity. She used the discounted cashflow method (DCF method) to determine each subsidiary's future earning capacity, which required her to determine the subsidiary's cashflow for distribution and then project that estimated cashflow into the future. She then ascertained the present value of the future cashflow and the terminal value (the value of the subsidiary at the end of the estimating period) using the appropriate discount rate, which is equal to the required rate of return on the basis of the subsidiary's estimated weighted average cost of capital. She added the present value and the terminal value together, along with the subsidiary's depreciation and capital expenditure differential benefit, to estimate each subsidiary's fair market value.

[*31] For her analysis, Ms. Rayner used cashflow projections that were based, in part, on her discussions with management. She determined the discount rate to apply to those cashflow projections in part by looking to comparable guideline companies (discussed in greater detail below). She used this information to calculate fair market values of approximately $335.1 million for CSI and PSI and $6 million for NorAm.

Because she was valuing each subsidiary as a whole, her valuations resulted in fair market values on a controlling interest basis. To determine whether a discount for lack of control was necessary, Ms. Rayner analyzed other factors related to CSI, PSI, and NorAm, such as operating margins, excess assets, and excess salaries for management. She found that each subsidiary appeared to be running at a very efficient level that was similar to the practices of a publicly traded company. Since elements of control generally would not accrue to minority shareholders of a publicly traded company, Ms. Rayner determined that a discount for lack of control would be necessary.

In addition to the income approach, Ms. Rayner also valued CSI and PSI using the market approach because she believed there were a sufficient number of reasonably comparable publicly traded guideline companies from which to derive

[*32] operating data to create valuation multiples.[8] She determined valuation multiples by dividing a market price point for each guideline company, such as its market value or total invested capital, by a specific item on its financial statements, such as its book value or earnings before interest, taxes, depreciation, and amortization (EBITDA).

Ms. Rayner initially chose, for comparison and computing valuation multiples, four publicly traded guideline companies: Exterran Holdings, Inc. (Exterran), BJ Services Co. (BJ Services), Weatherford International, Ltd., and Tesco Corp. She found each valuation multiple represented a minority-marketable multiple. Of the four guideline companies, Ms. Rayner determined that the operations of CSI and PSI could be "considered to be similar" only to Exterran and BJ Services. However, she decided that the difference in "size, business and geographic concentration" between CSI and PSI versus Exterran and BJ Services merited the use of a smaller valuation multiple in computing CSI's and PSI's fair market values.

Ms. Rayner calculated four different valuation multiples for Exterran and BJ Services, decreased the multiples to account for differences between the guideline

_____

[8] Ms. Rayner did not believe there were a sufficient number of reasonably comparable publicly traded guideline companies to value NorAm using the market approach.

[*33] companies and the subsidiaries, and applied the multiples to specific items on CSI's and PSI's financial statements (i.e. book value, EBITDA). She determined that these calculations resulted in a range of fair market values for CSI and PSI of $236.5 million to $282.8 million. Ms. Rayner contended that the values reflected a controlling interest because the decrease in multiples would be offset by premiums for control.

Ms. Rayner also used the similar transactions method as part of her market approach analysis, using her discussions with management to create a specialized valuation multiple for comparison with available market data. After discussions with CSI's and PSI's management, Ms. Rayner used a dollar-per-horsepower transaction multiple. She was unable to find similar transactions for comparison, so WEC's management provided an estimated average market price per unit of horsepower and information about CSI's and PSI's total fleet horsepower to help her create a fair market value of $307.9 million.

Ms. Rayner examined the range of fair market values that she calculated for CSI and PSI using the market approach and determined that the two subsidiaries' combined fair market value was approximately $269.8 million. She then reviewed the results of both the income and market approach and determined the fair market value of CSI and PSI was "reasonably represented as $309.0 million".

**[\*34]**                              ii.  Mr. Mitchell's Criticisms

Mr. Mitchell argued that Ms. Rayner's use of the income approach to value CSI, PSI, and NorAm resulted in fair market values of noncontrolling interests. He determined that the cashflow projections that Ms. Rayner used in determining each subsidiary's fair market value did not include specific assumptions about the ability of a shareholder to realize more for a controlling interest than a noncontrolling interest.  Mr. Mitchell also determined that Ms. Rayner's DCF method analysis failed to consider the impact of factors such as increased profits or changes in capital structure that would differentiate a controlling interest from a noncontrolling interest.  He concluded that Ms. Rayner's failure to address these issues resulted in fair market values for CSI, PSI, and NorAm that inherently reflected a noncontrolling interest.

Mr. Mitchell also argued that Ms. Rayner's valuation of CSI and PSI under the market approach was flawed in that she should not have decreased the multiples for CSI and PSI to reflect differences with the guideline companies and then applied control premiums to offset the decrease.  He noted that the multiples for the guideline companies that Ms. Rayner used in her analysis already represented minority-marketable multiples.  He contended that any downward adjustments to those multiples would still result in values of noncontrolling

[*35] interests, so the application of a discount for lack of control to those values would be improper.

### iii. Analysis

As to Ms. Rayner's valuation of CSI, PSI, and NorAm using the income approach, we agree with Mr. Mitchell that she did not analyze certain factors that would differentiate a controlling interest from a noncontrolling interest. But the Pratt treatise states that "[e]ven minority shares can have some elements of control. These elements of control may reduce, but rarely eliminate, the discount for lack of control." Pratt et al., supra, at 398-399. The Pratt treatise then lists three scenarios where a discount for lack of control would not apply (blocking power, swing vote, and takeover protection). Id. And in previous cases involving these types of control we have recognized that a discount would not apply. See Estate of Winkler v. Commissioner, T.C. Memo. 1989-231 (rejecting a discount where a minority block of stock had "swing vote characteristics"); see also Estate of Simplot v. Commissioner, 249 F.3d 1191, 1195-1196 (9th Cir. 2001) (rejecting our decision to apply a control premium to a controlling block of nonvoting stock because "[n]o 'seat at the table' was assured by this minority interest" that would result in an economic advantage for which a premium would be necessary), rev'g and remanding 112 T.C. 130 (1999); Estate of Bright, 658 F.2d at 1002-1008

**[*36]** (rejecting the Government's attempt to use family attribution principles to apply a control premium to a controlling block of stock for estate valuation purposes).

These types of control are not present here and thus cannot affect WEC's interests in CSI, PSI, and NorAm. Ms. Rayner's failure to analyze these factors does not render the values she computed noncontrolling. See Estate of Magnin v. Commissioner, 2001 WL 117645, at *15-*16. We conclude that WEC's interests involve minority shares with elements of control for which a discount for lack of control should be reduced but not eliminated.

As to Ms. Rayner's valuation of CSI and PSI under the market approach, we agree that her valuation resulted in fair market values on a noncontrolling interest basis. Ms. Rayner vaguely supported her reduction of the minority-marketable multiples to calculate CSI's and PSI's values under the market approach as necessary to reflect differences in "size, business and geographic concentration." We find this reasoning unconvincing. See Estate of Jung v. Commissioner, 101 T.C. 412, 443-446 (1993) (rejecting a lack of control discount where the incremental risk premium used to calculate the discount was derived solely as a result of a company's size). Her justification for reducing the multiples also undermines her analysis as it suggests that her guideline companies were not

**[*37]** similar enough to CSI and PSI.  See <u>Astleford v. Commissioner</u>, T.C. Memo. 2008-128, 2008 WL 2610466, at *8 (holding that when "comparables are relatively few in number, we look for a greater similarity between comparables" and the target entity).

Nor does Ms. Rayner's use of the similar transactions method as part of the market approach support a minority interest discount.  She failed to find comparable transactions for her selected dollar-per-horsepower multiple and relied on WEC's management to provide an estimated average market price per unit of horsepower.  We cannot rely on a similar transactions analysis when it "did not take into account any actual comparable transactions."  See <u>Estate of Baird v. Commissioner</u>, 416 F.3d 442, 450 (5th Cir. 2005), <u>rev'g and remanding</u> T.C. Memo. 2002-299.  Therefore we reject her valuation using this method.

       c.  <u>WREH and Warren Admin</u>

          i.  <u>Ms. Rayner's Approach</u>

Ms. Rayner did not determine a fair market value for WREH or Warren Admin.  A third-party appraiser estimated WREH's fair market value at $48 million, and WEC presented that value to Ms. Rayner for her analysis.  Warren Admin was not included in Ms. Rayner's analysis.

**[\*38]** She did, however, determine that the fair market value for WREH was on a controlling interest basis because it owned all of the WEC-related real estate. She also determined that a discount for lack of control was necessary because WREH was paid fair market rent, which means a minority shareholder in WREH would not expect to increase rent to maximize value.

## ii. Mr. Mitchell's Criticisms

Mr. Mitchell did not dispute the third-party appraisal of WREH or Warren Admin's exclusion, but he did dispute Ms. Rayner's contention that the valuation of WREH resulted in a fair market value on a controlling interest basis. He briefly examined the valuation of WREH in his report and concluded that the valuation of WREH was of a noncontrolling interest. He argued that a controlling investor and a minority investor would receive the same value because WREH's assets are imbedded in the going-concern operations of WEC, so no lack of control discount is necessary.

## iii. Analysis

As with CSI, PSI, and NorAm, Ms. Rayner did not analyze elements that would differentiate a controlling interest from a noncontrolling interest, but her failure to analyze these factors does not render the values she computed noncontrolling. As we did above with respect to CSI, PSI, and NorAm, we

[*39] conclude that WEC's interests in WREH involve minority shares with elements of control for which a discount for lack of control should be reduced but not eliminated.

### d. Conclusion Regarding Minority Discount

In sum, we conclude that most of Ms. Rayner's valuations of WEC subsidiaries produced values of interests with at least some elements of control. We therefore conclude that some discount should apply in valuing a minority interest in WEC common stock. See Estate of Magnin v. Commissioner, 2001 WL 117645, at *14 (citing Estate of Newhouse v. Commissioner, 94 T.C. at 249, in holding that it is "unreasonable to argue that no discount should be considered for a minority interest in a closely held corporation").

We now turn to the appropriate amount.

### e. Discount for Lack of Control

To identify the appropriate lack of control discount, Ms. Rayner reviewed information reported by Mergerstat Review regarding the five-year average premiums paid in construction, mining and oil equipment, and machinery industry transactions and Universal Compression Holding, Inc.'s acquisition of Hanover Compressor Co. in 2007. She then used the formula (control premium / [1 + control premium]) to determine a range of discounts from 20% to 25%, concluded

[*40] that the low end of the range was most appropriate, and determined that a 20% lack of control discount should apply.

We reject Ms. Rayner's 20% discount for lack of control. First, as noted above, not all of her methods produced controlling interest valuations. More importantly, she valued WEC as a holding company but computed her discount using construction, mining and oil equipment, and machinery industry transactions. While WEC's subsidiaries were heavily involved in that industry, we conclude that Ms. Rayner should have considered comparable holding companies.

Because Mr. Mitchell determined that Ms. Rayner's valuations all resulted in values on a noncontrolling interest basis, he argued that a discount should not apply and did not present an alternative method for computing one. We therefore look to our previous decisions involving computation of a minority interest discount for a holding company. See Estate of Litchfield v. Commissioner, T.C. Memo. 2009-21, 2009 WL 211421, at *16 (applying minority interest discounts of 11.9% and 14.8%); Lappo v. Commissioner, T.C. Memo. 2003-258, 2003 WL 22048909, at *9 (applying a 15% discount); Hess v. Commissioner, T.C. Memo. 2003-251, 2003 WL 21991627, at *17 (applying a 15% discount). We conclude that a 15% discount reasonably reflects the lack of control that a buyer of WEC common stock would have. Applying this 15% discount for lack of control and

[*41] 30% discount for lack of marketability that both experts agree are appropriate results in a fair market value of $912 per share of WEC common stock.

### 2. Longspar Limited Partnership Interest

To value a limited partner interest in Longspar, petitioners rely on Mr. Shrode and respondent relies on Mr. Mitchell. They agree generally on the methodology for valuing Longspar; they disagree only on the appropriate discounts for lack of control and lack of marketability. Both value Longspar as a holding company and rely upon Ms. Rayner's valuation of WEC common stock as their starting point, as WEC common stock shares accounted for approximately 99% of the value of Longspar's assets.

Mr. Shrode used what he believed was the only appropriate approach (asset-based) and method (net asset value). He started with Ms. Rayner's fair market valuation of WEC common stock of $860 per share, added in the value of Longspar's other non-WEC assets, and deducted Longspar's liabilities to determine the controlling,[9] marketable value of Longspar as of December 31, 2008, to be $57,305,837.

---

[9] Mr. Shrode did not determine the value of Longspar's other non-WEC assets or liabilities, but rather accepted management's representations as to those values. These values are not in issue.

**[*42]** Mr. Mitchell used a similar methodology, starting with Ms. Rayner's valuation, but his adjustment to remove her lack of control discount produced a controlling, marketable value for Longspar, as of December 31, 2008, of $71,246,611, instead. Adjusting the experts' methodology to account for the 15% lack of control discount that we decided was reasonable for Ms. Rayner's valuation above results in a controlling, marketable value for Longspar, as of December 31, 2008, of $60,729,361.

Mr. Shrode removed the 1% general partner interests and applied a 15% discount for lack of control and a 30% discount for lack of marketability to determine the fair market value of Longspar's limited partner interests as of the valuation date to be $33.8 million. He used this value to compute 1%, 6.14%, and 58.65% limited partner interests in Longspar to have fair market values of $341,000, $2,096,000, and $20 million, respectively.

By contrast, Mr. Mitchell opined that discounts of 5% for lack of control and 25% for lack of marketability are appropriate. Applying those discounts to his higher starting valuation of Longspar's assets, Mr. Mitchell determined the fair market value of Longspar's limited partner interests as of the valuation date to be $50.8 million. He used this value to compute 6.14% and 58.65% limited partner interests in Longspar to have fair market values of $3,116,861 and $29,772,623,

**[*43]** respectively.  To resolve this dispute between the experts we focus our analysis on their methodology for deriving their discounts.

### a.  Lack of Control Discount

#### i.  Mr. Shrode

Mr. Shrode determined that a discount for lack of control was necessary to determine a limited partner minority interest in Longspar because a hypothetical buyer of a limited partner's minority interest in Longspar would not have any control over the company's operations or decisions and 100% of Longspar interests, operations, and decisions were controlled by one family rather than independent investors.  To determine the discount, Mr. Shrode looked to the public market valuations of closed-end funds that own nonmarketable securities.  Consulting a 2008 report containing the trading values for 43 closed-end funds, Mr. Shrode ultimately identified three nondiversified closed-end equity funds that were comparable to Longspar in that the funds owned assets that were held for long-term appreciation and were not publicly traded.  These three funds traded over the previous five years up to the valuation date at an average lack of control discount of 11.2%.

Mr. Shrode did observe several differences between Longspar and the 43 closed-end funds in his analysis.  Longspar had a shorter history than most of the

**[*44]** closed-end funds, and investment decisions were left to Longspar's general partners' discretion (they did not have clear and stated investment objectives). Longspar was significantly smaller than the three comparable nondiversified closed-end equity funds. One of the funds, Engex, Inc., was focused on biotechnology and could only invest up to 15% of its assets in nonmarketable securities, while the remaining two funds were investment management companies that managed a wide range of securities with no particular focus on family-owned assets. Mr. Shrode considered excluding Engex from his analysis, but he decided that would create too narrow a comparison. He instead adjusted for the additional risk characteristics that set Longspar apart from the rest of the closed-end funds to determine a discount of 15%.

## ii. Mr. Mitchell

Respondent contends that Mr. Mitchell's discount computation analysis is more thorough than Mr. Shrode's. To calculate a discount, Mr. Mitchell considered 30 closed-end funds that were classified as general equity funds. He found that the average control discount for those funds was 14.4%, the median discount was 17%, and the standard deviation between the funds' discounts was 7.4%. He observed that the standard deviation indicated a relatively wide discount range for his fund sample.

[*45] After completing his calculations, Mr. Mitchell noted that closed-end fund discounts "remain something of an anomaly, with no definitive conclusion based on empirical support as to the causes of such discounts" before noting some of the factors and company characteristics that may contribute to the variability in discounts. He then examined these factors and company characteristics in his fund sample and determined that Longspar was not comparable to any of the other closed-end funds. He determined that there would be almost no possibility of a lack of control disadvantage for a minority owner of Longspar except "under certain circumstances, the precise nature of which cannot be exactly determined with reference to empirical/market data." Mr. Mitchell concluded that he should apply a discount to account for that remote possibility, so he calculated a 5% discount by reducing the average discount for his sample funds by one standard deviation "to account for the differences in control characteristics of the funds in comparison to * * * [Longspar]" and then reducing that figure further by 2% to account for "the probability that * * * [Longspar] would undertake any significant change in its operating profile, while non-zero, is not necessarily significant as of the Valuation dates."[10]

---

[10] There is no evidence in the record telling us why Mr. Mitchell selected the standard deviation for his first reduction and 2% for his second reduction.

**[*46]**                                iii.  <u>Analysis</u>

Both experts' analyses suffer from a lack of suitable comparables to Longspar.  Where the comparables are relatively few in number, we look for a greater similarity between comparables and the subject company.  <u>See</u> <u>Astleford v. Commissioner</u>, 2008 WL 2610466, at *8.  We do not find any of the funds identified by Mr. Shrode and Mr. Mitchell to be suitable comparables for Longspar.  We therefore reject both experts' analyses and proposed discounts.  <u>See</u> <u>Chapman Glen, Ltd. v. Commissioner</u>, 140 T.C. 294, 343 (2013) (rejecting an expert's comparables in part because they "were for the most part not comparable" to the subject properties).

We agree with both experts, however, that a discount should be applied to reflect the possibility of a lack of control disadvantage for a minority owner of Longspar.  To decide that discount, we will not endorse either expert's calculations, but we will consider and draw selectively from their testimony.  <u>See</u> <u>Parker v. Commissioner</u>, 86 T.C. at 562.  Because valuation involves an approximation, "the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence."  <u>Estate of Heck v. Commissioner</u>, T.C. Memo. 2002-34, 2002 WL 180879, at *6.  While we found Mr. Mitchell's

[*47] explanation of how he derived his discount unconvincing, we do agree with him that the possibility of a lack of control disadvantage for a minority owner is remote. We therefore adopt a 5% lack of control discount for a hypothetical buyer of a Longspar limited partnership interest.

### b. Lack of Marketability Discount

#### i. Mr. Shrode

Mr. Shrode determined that a discount for lack of marketability also was necessary because nonmarketable assets like WEC common stock are less liquid than their marketable counterparts. To determine the discount Mr. Shrode looked to several studies on the sales of restricted stock with a two-year holding period and private, pre-initial-public-offering (IPO) stock.

Mr. Shrode found an average discount in the range of 30% to 40% in the studies involving sales of restricted stock, and 40% to 45% in the studies involving sales of private, pre-IPO stock. On the basis of this analysis, Mr. Shrode selected a discount of 30%.

#### ii. Mr. Mitchell

Mr. Mitchell compiled a range of discounts from 22% to 34% by using quantitative models that looked at the role of liquidity premiums in calculating the value of a forgone put option on the basis of the Black-Scholes model and

**[\*48]** considering hypothetical rates of return on Longspar's assets. Like Mr. Shrode, he also examined several studies on the sales of restricted stock and pre-IPO stock, but these studies involved more recent data. On the basis of these studies, Mr. Mitchell concluded that the approximate range of discounts was 20% to 35%. Mr. Mitchell reconciled these two ranges of discounts and determined that a 25% discount should apply because 25% was approximately equal to the mid-point of these two ranges and there should be an incremental discount from the 30% discount applied to the WEC common stock.

### iii. Analysis

The two experts are only 5% apart. Mr. Shrode's analysis depends on several studies on the sale of restricted stock and private, pre-IPO stock that have been brought to the attention of this Court before. See Estate of Gallagher v. Commissioner, T.C. Memo. 2011-148, 2011 WL 2559847, at \*20; Estate of Bailey v. Commissioner, T.C. Memo. 2002-152, 2002 WL 1315805, at \*10; Furman v. Commissioner, T.C. Memo. 1998-157, 1998 WL 209265, at \*17 (listing examples of cases from 1978 through 1995 involving these studies). And in those cases we have repeatedly disregarded experts' conclusions as to discounts for long-term stock holdings when based on these studies. See Estate of Bailey v. Commissioner, 2002 WL 1315805, at \*10; Furman v. Commissioner, 1998 WL

**[\*49]** 209265, at \*17.  Accordingly, we will disregard Mr. Shrode's conclusions as to a discount for Longspar which was based on these studies.  See Estate of Bailey v. Commissioner, 2002 WL 1315805, at \*10.

We conclude that Mr. Mitchell's analysis was more thorough than Mr. Shrode's analysis in that Mr. Mitchell considered a larger range of data (quantitative models and studies with more recent data) to compile two ranges of discounts and calculate a reasonable discount for lack of marketability for Longspar.  However, we do not think Mr. Mitchell justified his selection of a 25% discount instead of a 30% discount.  As part of his analysis, Mr. Mitchell found that the comparable guideline company discounts ranged from 22% to 34% using the income approach and 20% to 35% using the market approach.  Mr. Mitchell contends that Longspar's discount should be incrementally lower than WEC's discount because the marketability of WEC shares was considered in computing the WEC discount.  While his contention is reasonable, he provides no support for his conclusion that 25% is appropriate other than his claim that 25% was equal to the median of the ranges (we note that 28% is the median) and his professional opinion.  We therefore will adopt the median in Mr. Mitchell's analysis--28%--which reflects his more thorough analysis and stated rationale.

**[*50]** V.  <u>Conclusion</u>

We summarize our conclusions as follows.  First, Mrs. Nelson transferred 6.14% and 58.65% Longspar limited partner interests to the Trust.  Next, discounts of 15% for lack of control and 30% for lack of marketability should apply to the valuation of WEC common stock, resulting in a fair market value of $912 per share.  Therefore, the controlling, marketable value of Longspar is $60,729,361.  Discounts of 5% for lack of control and 28% for lack of marketability should apply to calculate the fair market value of a Longspar limited partnership interest.  As a result, a 1% Longspar limited partner interest has a fair market value of $411,235 and the 6.14% and 58.65% Longspar limited partner interests Mrs. Nelson transferred to the Trust have fair market values of $2,524,983 and $24,118,933, respectively.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

<u>An appropriate order will be issued,</u> <u>and decisions will be entered under Rule</u> <u>155</u>.